v. James Blair Thank you again, Your Honor. Stephen Williams for the defendant, Appellant James Blair. In the previous argument, we spoke a lot about comprehensive transaction and why the cases were improperly joined and why it's Mr. Blair's position that this was an abuse of discretion. All of the arguments with respect to that initial analysis of whether or not these represent the same comprehensive transaction is the same except prejudice analysis is slightly different because what we're talking about in the armed robbery cases is the reverse. But it's still a very similar argument. In this case, the cross-pollination that we're talking about is the introduction of there being marijuana in Mr. Blair's vehicle hours later that was discovered at the impound. And why that is prejudicial in this particular case is twofold. First of all, we have other crimes evidence that's not admitted under 404B so that we've got bad character evidence. But more importantly, we have the evidence of marijuana showing propensity when what we have is direct evidence as testified to by the witnesses relating to the perpetrator demanding marijuana. The State's position is that connects the two cases when, in fact, the introduction of the marijuana that was found in Mr. Blair's vehicle is simply being used to show the propensity in this particular case. And, again, had there been marijuana stolen and then later it had been found in his vehicle, totally different case. Then you have direct evidence wherein the marijuana that was found in his car would have been an outgrowth. There was some direct evidence, and I contrast this to the money, there was direct evidence of money being stolen. And so the fact that there was cash on Mr. Blair was certainly relevant. So the seizure of this cash was a relevant fact and it was arguably at least something that the jury can consider an outgrowth of the armed robbery because we know from the witnesses' testimony that cash was taken. And there was some evidence in debate about where he had obtained the cash. He had witnesses on this. But it was a fair point to be debating because that was an outgrowth of the armed robbery unlike finding marijuana in his car hours later wherein the marijuana was not taken at the robbery. That is only used for propensity purposes. That is what the State is arguing. Here, still on appeal, it should be used for without having gone through until today any analysis whatsoever under 404B as to why that evidence should have been admissible for that purpose. The other issue that I want to tackle more head-on in this appeal on the armed robbery case is the testimony of Mr. Bagwell. The prosecuting attorney, prior to Mr. Blair's trial and prior to Mr. Bagwell's case going to trial or rather pleading out, put his hand on Mr. Bagwell and said it's going to be okay. Now, there could be only one thing he's referring to and that's Mr. Bagwell's case. He's not asking him about and he didn't testify in the post-conviction proceeding in any way, so that is the reasonable inference that a jury would draw. He's talking to him about Mr. Bagwell's own case. Mr. Bagwell did not want to do an open plea. He was told it would be okay and his attorney was told, hey, while Blair's case is pending, now he didn't, I can see they didn't use the term Blair. They said Bagwell's testifying in another case and while that case is pending, there will be no deals. That is what was conveyed. So you've got the combination of these two statements which tells Mr. Bagwell it's going to be okay but not until after I testify. Now, I don't see how that cannot be exculpatory evidence or at least evidence that in some way diminishes the credibility of Mr. Bagwell who, as it relates to this case, changed his testimony from what he had said to the police officers and it went from he shouldn't have had a gun to shouldn't have shot somebody. When he testifies at trial, it shouldn't have shot somebody. Now, that's a pretty damning statement and it's supposedly coming from somebody who was a friend and is not expecting or hoping anything at all in return for his testimony but his statement did change. The significance of that cannot be understated and what the State has complained about is that, hey, if we've got to disclose this, then you'll use it against us. Well, if you want to use Mr. Bagwell as a witness and you're holding off on dealing with him until after Mr. Blair's trial is over, then that's something that has to be disclosed and discussed. The jury has to be exposed to that. Defense counsel has to be given an opportunity to explore it. That is the essence of being able to cross-examine a witness unbiased in credibility. And we were, Mr. Blair was, not afforded that opportunity because that wasn't disclosed. What was used here was essentially a workaround. We should be able to use this workaround, according to the State, so that you can't impeach our witness with this type of evidence. That's what's being complained about. It does not, as the State suggests in its brief, pose any kind of a conundrum. There's one answer, Your Honors. You disclose it. If your case is strong, you've got an additional witness who's testifying to things that are relevant, and the witness has things that they can be cross-examined on related to their credibility, and the jury gets to hear those things, and now you have a clean drop. But without that, you have a prejudice, without being able to fully cross-examine this witness, that relates directly to testimony concerning shooting somebody. You combine that with other prejudice that's related to the introduction of marijuana, where that's introduced solely for purpose of propensity when you're talking about possession with intent and a demand for marijuana, even though there's no connection between those two offenses. And you have eyewitness testimony, which the State relies on, and we can see it's sufficient. The issue here is whether there's any reasonable probability that the outcome could have been different had these cases not been joined, had there been a sufficient opportunity to cross-examine Mr. Bagwell. You have eyewitness testimony to varying degrees of certainty as to their certainty about who this person was. There were opportunities for the witnesses to talk to one another. So there was ample ways that they could be cross-examined to suggest that the evidence was overwhelming, and it could not have turned out differently if the cases hadn't been joined and if Mr. Bagwell's, if the information concerning Mr. Bagwell's at least potential deal was disclosed, isn't true. It could have been different if those things had been present in two trials as opposed to one. Thank you, Your Honors. May I please support the counsel? My name is Sharon Shanahan, and I represent the people of the State of Illinois. I'm going to touch briefly on the Brady question, but I'd like to then move on to the question of prejudice since both the Joiner issue and the Brady issue can be resolved if the defendant was not prejudiced by what happened in either case. So in order to succeed in a Brady violation, the defendant has the burden of proof, and he has to show that the evidence was favorable to the defendant because it was either exculpatory or impeaching, that it was either willfully or inadvertently withheld from the defendant by the state, and that withholding the evidence resulted in prejudice to the defendant. Now, this is the entire Brady violation. It will be okay. That's it. The state's attorney is, according to a third party, who had no idea what anybody meant by this, but he hears the state's attorney say, Did you get your subpoena? Yes. And then, again, we don't know since this is a third party thing. At some point, he says it will be okay. Now, the counsel for the defendant says that he had to be talking about Blair. Why? Why did he have to be talking about Blair? They were in court for the DUI, a DUI that could result in the loss of driver's license, a DUI that could be a case that could result in the loss of the defendant's driver's license, could even put him in jail. So it seems pretty reasonable to say it will be okay. But in any case, to say that that one statement is a violation of Brady, especially when you look at the testimony about this issue, Bagwell's sworn testimony is that there were no promises or suggestions that the statement about the defendant would help his DUI probation revocation. There were no discussions, promises of leniency, or deals regarding his testimony against the defendant, and he got no special treatment. And the fact finder knew this when he testified in Mr. Blair's trial. What was the ultimate disposition on Bagwell's underlying charges? His driver's license was, I've got to get my termination right, he lost his driver's license. It wasn't just suspended, it was revoked. And that's not what he wanted. He wanted the suspension. He also didn't want to go to jail, and he didn't have to go to jail, but that's not an unusual resolution of a DUI. So that resolution of that underlying DUI, was that a common resolution for that type of offense? That was the testimony at the hearing. The defendant's own attorney testified that the defendant received no special treatment. Excuse me, Mr. Bagwell's. Mr. Bagwell's, the witness's attorney. He received no special treatment. State didn't agree to anything. There were no discussions about the defendant's case at all. And that when he tried to hint to the ASA, and that word hint, I believe, is counsel's word, Mr. Bagwell's attorney's word, that maybe the testimony against Mr. Blair might be worth something. He was told nothing would be offered for his testimony. And as I said, eventually he admitted the petition. His driving privileges were revoked, which was much more substantial than the suspension that he had received previously. The ASA in Mr. Bagwell's case said not only was no deal struck between the State and Mr. Bagwell for his testimony in the defendant's case, he and Mr. Bagwell's attorney never discussed Mr. Blair's case. When Mr. Carroll, counsel for Mr. Bagwell, first appeared on Mr. Bagwell's behalf, State even objected to releasing him under cognizance. That's the first thing that happened. And then although Mr. Carroll decided to, or tried to negotiate a disposition that would leave Mr. Bagwell on supervision, the ASA didn't agree. And eventually, as I said, ended up with a judgment of conviction revoking his license. So it's not like, I mean, the evidence is just, there's just nothing to indicate that it will be okay is a grave violation. Well, counsel, the defendant's position that they had a right to know, so they could cross-examine, maybe that's the determination, but it's a credibility determination at that point by the jury. And so, you know, the defendant never was afforded that right. What we have here is another attorney that was in the courtroom during the DUI hearing, not Mr. Bagwell's attorney, but another attorney, that just happened to be sitting in the courtroom that day, that overhears this and overhears the State's attorney say, it'll be all right. And that attorney had heard that statement and had no context for it. Is that correct? Yes. He didn't hear the previous five sentences or anything like that? He had no idea what was meant by this. And again, do you have to disclose that, I mean, we don't know why the State's attorney said this, and given the serious DUI charges that Mr. Bagwell was facing, can we assume that that statement, it will be okay, was in reference to Mr. Blair's case? And if it wasn't, then of course it doesn't need to be disclosed. It's just too tenuous a connection and too vague a statement, especially when in consideration of the fact that Mr. Bagwell, Mr. Bagwell's attorney and the ASA that handled Mr. Bagwell's case all said, no promises, no talk about it at all. And to say that, oh, well, I held out hope that after it was over, I would, well, everybody does, every criminal. That would be true of any criminal defendant. Assuming that the statement would have been disclosed to defense counsel, was there any State's position on the disparity in outcomes of the underlying case? Okay. If that had been disclosed, would it have made a difference? That's just exactly what I wanted to move on to. I thought so. Thank you. Both the jointer issue and the Brady issue require prejudice to the defendant. So if we move to the armed robbery issue, there were five people in the house. One person never came out of the room. But the other four, Brendan Richter had met the defendant at least two times. He said that he was pretty sure it was, I'm not even going to try and pronounce this, I know all about it. Stephanie's, Henry DeGioia's boyfriend. And it is established in the record that Stephanie's boyfriend was the defendant. So he says he doesn't know his name, but it was Stephanie's boyfriend. He's seen him at a local bar. He saw him hitting on Emily, the roommate that did not come out. He recognizes him by his demeanor, by the way he walked, and especially by the way he talked. And as cited in the state's brief, recognition of speech is a recognized reason for, accepted reason for identifying a defendant. He saw the intruder's eyes, cheeks, nose, and part of his mouth. He noticed that the intruder was white, talked black, and acted like a thug and that his language was very unlike Clinton County. Haley Schroeder, pretty much the same thing. The voice, the stature, she didn't know his name, but this was, again, the guy that hit on Emily. Nicole Grantham identified the defendant in her 911 call to the police. The shooting victim, of course, he's not in real good shape after being shot, so he's kind of out of it at first, but when he's interviewed at the hospital, he identifies the defendant and he said he was absolutely certain it was the defendant. And then we have other evidence such as the intruder's knowledge of where the security camera was in the house, the fact that he was looking for cannabis and the defendant had THC in his system. He took cash from Ryan and was arrested with a great deal of cash on his person. And minutes later was seen driving wildly through his neighborhood. As far as the prejudice in the drug case, because I didn't touch on that before. It doesn't sound like you have a chance to touch on it now either. It's in our briefcase. Okay. Thank you. Thank you, Your Honor. I'm going to start with the issue of what we're talking about when we say, and what's being referred to when we say, or when the prosecutor says it will be okay. It's not Mr. Blair's case. It's Mr. Baglot's case. Just that we agree with the state. That's what was being argued. He was talking about Mr. Baglot's case. And that's the problem. How do we know he was talking about Baglot's case with just that statement? Well, certainly one could draw that inference. We could, but we have three different, you know, two officers of the court and the defendant himself saying that no deals were made and they never discussed Baglot's case with that ASA. Well, what the assistant state's attorney said was there will be no deals while Blair's case is pending. And that's what was said to the defense attorney. Can you clarify that? I mean, specifically while Blair's case is pending or while another case is pending? Well, what he said was he's a witness in another case. And that was the only other case he was a witness in. Correct. Yes, Your Honor. And I think I tried to be careful about that before and I was less careful now. I don't think he referred to Mr. Blair specifically. But that's the only inference that could be drawn. So he's facing a case. He's worried about the case. He wants a deal. He can't get a deal because he's a witness in another case. Was a deal ultimately offered? Yes, it was. Now, was that deal a sweetheart deal? Maybe it wasn't. I'm not contesting. It doesn't matter from our point of view. The fact was he got a deal and he didn't want to go to jail and he didn't go to jail. And the deal he got, he couldn't get until after he testified. While he's worried about that, before he has a lawyer, the prosecutor says it will be okay. Now, could he have been talking about the weather or one of his relatives? It's possible. But he said, did you get your subpoena? It will be okay. The most likely thing he's speaking about is exactly what the state agrees is the most likely thing he's speaking about. And that's Mr. Bagwell's own case, which he's worried about. And he doesn't get that deal until after he has testified. And it's shortly thereafter that he gets the deal and he enters a plea. Those are the things that should have been disclosed. Because absent that, what we're allowing is exactly what happened, is an attempted workaround to then shield the jury or finder of fact from access to information that would tend to discredit the witness, a witness whose testimony changed in a very substantial, significant, and damning way, especially as it relates to the robbery case, because it went to making an admission about a gun to, I shouldn't have shot somebody. So you've got a significant change, something that had never said about shooting somebody, and now he's testifying to it, he's got this case hanging over him, and he's talking about, now, that Mr. Blair said, I shouldn't have shot somebody. And all of Bagwell's testimony goes towards identifying the defendant in this case, the Blair case. Is that correct? Not to identify him. He already knew him. It's only as to these statements, these inculpatory statements that Mr. Blair allegedly made to his former friend, Mr. Bagwell. So he's making these statements that are being attributed to him that connect him to this armed robbery. And especially when he's talking about shooting somebody. So he was never denying in this case that he was there, he was the person that perpetrated the robbery. Certainly he was, but in terms of that's what I'm just saying, Your Honor, is that that's what Bagwell's, yes, he is connecting him to the robbery, not through identification, but simply through the inculpatory statements that he claims that he made. So what's the likelihood of the defendant being tied to this crime, the armed robbery, the shooting, absent Bagwell's testimony? Well, we can see there's sufficient evidence to convict. But the issue here is if you can cross-examine Bagwell effectively in discrediting this witness. Secondly, if you don't have evidence of other crimes and propensity, what you have are eyewitness identifications, admittedly, that are of varying degrees of certainty. And that's what you have to cross-examine, to cross-examine the witnesses. And we're talking about the eyewitness identifications. We've got one saying because of the voice. Do you want me to finish, Your Honor? I think we can address it. If you would finish that and I have one other question. Certainly. So we've got a witness talking about I ID'd him by his voice and the way he talked. We have a witness IDing him about his eyes, his voice. Also talked to a roommate about it to verify that, one of the other witnesses. High degree of certainty, this is Ms. Grantham. She didn't say that in the 911 call. That was what came out at trial. And then Mr. Vandiver, who had been shot, didn't have any idea until he talked to Ms. Grantham. And so while when you put it all together, maybe there's sufficiency, but all of these witnesses had an opportunity to converse about this. Mr. Vandiver even had motive, which we discuss in a brief, about why he might make something up about Mr. Blair. These are fertile areas of cross-examination that, absent this other evidence, could have had an impact on the trial. One last question, and I don't recall from having read the briefs. Was there a gun found? Was the gun in question found on the defendant's possession or in his possession? I don't believe so, no. I've had a loss to make a statement about that other than I don't believe so, Your Honor, but I'm sure the state would be arguing that vociferously if there was. I'm pretty sure that wasn't in evidence. Okay. Thank you, Your Honor. Thank you, counsel. Appreciate your arguments in this case and in both cases. Actually, the court takes it in this manner under 5 minutes.